1  Michael Jason Lee, Esq. (State Bar No. 206110)
2  **LAW OFFICES OF MICHAEL JASON LEE, APLC**
3  4660 La Jolla Village Drive, Suite 100
   San Diego, California 92122
4  Telephone: (858) 550-9984
   Email: michael@mjllaw.com
5
6  Adam C. Ford, Esq.
   Renée L. Jarusinsky, Esq.
7  Bryan W. McCracken, Esq.
8  **FORD O'BRIEN LANDY LLP**
   275 Madison Avenue, 24th Floor
9  New York, New York 10016
10 (*pro hac vice applications forthcoming*)

11 Attorney for Petitioners
   Eduard Yurievich Khudainatov
12 and Millemarin Investments Ltd.,
13 a British Virgin Islands Company

14

15              **UNITED STATES DISTRICT COURT**
16           **SOUTHERN DISTRICT OF CALIFORNIA**

17 EDUARD YURIEVICH              Case No.: **'23CV1946 W   SBC**
18 KHUDAINATOV and
   MILLEMARIN INVESTMENTS        **MEMORANDUM IN SUPPORT OF**
19 LTD., A BRITISH VIRGIN        **MOTION FOR RETURN OF**
   ISLANDS COMPANY,              **PROPERTY PURSUANT TO**
20                               **FEDERAL RULE OF CRIMINAL**
21          Petitioners,         **PROCEDURE 41(g)**
22
                                 **DEMAND FOR HEARING/**
23      vs.                      **JURY TRIAL**
24 UNITED STATES OF AMERICA,
                                 Name of Judicial Officer:
25          Respondent.          Courtroom Number:
26                               Date & Time of Hearing:
27
28

# **TABLE OF CONTENTS**

**PAGE(S)**

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS ................................................................... 5

    I.    THE MOTOR YACHT AMADEA ................................................... 5

        A.    Mr. Khudainatov commissioned the building of
the Amadea .............................................................. 6

        B.    Mr. Khudainatov transferred the Amadea's ownership
from Nereo to Millemarin, and remained the UBO ............... 7

        C.    Amadea's management considered charter requests,
including a long-term charter for a single client .................... 8

        D.    After the long-term charter, the Amadea was heading
to the Philippines for five weeks of planned maintenance ...... 9

    II.    THE POLITICAL BACKGROUND LEADING TO THE
AMADEA'S SEIZURE .................................................................. 10

    III.    THE APPLICATION FOR THE SEIZURE WARRANT ............... 13

    IV.    POST-SEIZURE EVENTS ........................................................... 16

ARGUMENT .................................................................................... 18

    I.    PETITIONERS SATISFY THE *RAMSDEN* FACTORS;
THIS COURT SHOULD EXERCISE ITS EQUITABLE
JURISDICTION ........................................................................... 18

        A.    The government callously disregarded the Fourth
Amendment by seizing the vessel based on a false
and misleading affidavit ............................................ 20

            1.    The Bergen Affidavit includes falsified
witness statements ....................................... 21

i

2. The Bergen Affidavit relies on unidentified witness statements giving the false impression that the witnesses had a sufficient basis of knowledge ................................................................. 23

3. The Bergen Affidavit asserts certain facts as evidence of ownership, when the government knew they were not ........................................................ 25

4. The Bergen Affidavit falsely claims that the Amadea sought to evade detection, when readily available information showed otherwise .......... 29

5. The Bergen Affidavit obscures the absence of any link between Kerimov and the U.S. transactions that provide the entire basis for the seizure ................. 30

B. Petitioners own the Amadea, and therefore have an individual interest in and need for the property ................. 32

C. Petitioners would be irreparably injured by denying the immediate return of the property ....................................... 33

D. Petitioners have no adequate remedy at law ............................. 34

II. PETITIONERS ARE PRESUMED ENTITLED TO THE AMADEA'S RETURN ........................................................................ 35

III. THIS COURT SHOULD GRANT PETITIONERS A *FRANKS* HEARING ........................................................................ 36

CONCLUSION ................................................................................. 38

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Franks v. Delaware,*
   438 U.S. 154 (1978)..................................................................... 22, 25, 36

*Illinois v. Gates,*
   462 U.S. 213 (1983)......................................................................... 14, 24-25

*Omidi v. United States,*
   851 F.3d 859 (9th Cir. 2017) ......................................................... 34-35

*Ramsden v. United States,*
   2 F.3d 322 (9th Cir. 1993) ............................................................. passim

*United States v. Brown,*
   631 F.3d 638 (3d Cir. 2011) ........................................................... 23

*United States v. Ibrahim,*
   522 F.3d 1003 (9th Cir. 2008) ....................................................... 4, 19

*United States v. 7725 Unity Ave. N,*
   294 F.3d 954 (8th Cir. 2002) ......................................................... 32

*United States v. Cervantes,*
   703 F.3d 1135 (9th Cir. 2012) ....................................................... 14, 25

*United States v. Chesher,*
   678 F.2d 1353 (9th Cir. 1982) ....................................................... 29, 30

*United States v. Cortina,*
   630 F.2d 1207 (7th Cir. 1980) ....................................................... 23

*United States v. DeLeon,*
   979 F.2d 761 (9th Cir. 1992) ......................................................... 25

*United States v. Harrell,*
   530 F.3d 1051 (9th Cir. 2008) ....................................................... 33

*United States v. Kolodziej,*
   712 F.2d 975 (5th Cir. 1983) ......................................................... 25

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

*United States v. Martinson,*
   809 F.2d 1364 (9th Cir. 1987) ......................................... 18-19, 33, 35

*United States v. Real Prop. & Premises*,
   657 F. Supp. 2d 1060 (D. Minn. 2009)............................................ 32

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ........................................................ 19

*United States v. Stanert*,
   762 F.2d 775 (9th Cir. 1985) ........................................................ 25

**Statutes**

18 U.S.C. § 1956................................................................................ 3, 16

28 C.F.R. § 0.111(i) ............................................................................ 17, 34

50 U.S.C. § 1705(a) ................................................................................ 16

**Federal Rules**

Federal Rule of Criminal Procedure 41(g) ...................................... passim

**Other Authorities**

*Gibani v. Barr*, No. EDCV191009JGBKKX, 2019 WL 8112511, at *2 (C.D. Cal.
   Oct. 11, 2019) ........................................................................................ 34

*In re Search Warrants Served on Home Health & Hospice Care, Inc.*, No. 96-
   4813, 1997 WL 545655, at *1, *7 (4th Cir. 1997) .................................... 22-23

U.S. CONST. amend. IV............................................................................ 20

U.S. DEP'T OF JUSTICE, Asset Forfeiture Policy Manual (2023)..................... 17, 34

U.S. DEP'T OF TREASURY, Report to Congress Pursuant to Section 241 of the
   Countering America's Adversaries Through Sanctions Act of 2017 ............... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

## PRELIMINARY STATEMENT

More than a year and a half ago, the Department of Justice ("DOJ") wrongfully seized the Motor Yacht Amadea (International Maritime Organization No. 1012531) (the "Amadea"), an asset valued by the government at $330 million. The Amadea is owned by Petitioner Eduard Khudainatov, a Russian national who is not, and has never been, sanctioned in the United States. He is not under indictment or a party to any civil or regulatory proceedings. Instead of following the facts wherever they led, the government reverse-engineered a hasty investigation to garner "facts" to fit the false narrative that Mr. Khudainatov wrongfully acted as a straw owner to hide the ownership of a sanctioned individual.

Since September 2022, Petitioners' counsel has engaged in substantive discussions with the government and has demonstrated that this theory was wrong: that Mr. Khudainatov owns the Amadea lawfully, and not on anyone else's behalf. The government has since concluded its investigation of Mr. Khudainatov by letter dated September 28, 2023:

> Dear Mr. Ford and Ms. Jarusinsky,
>
> We write regarding the investigation run by the Task Force KleptoCapture component of the U.S. Department of Justice (hereinafter "the Department") into your client, Eduard Khudainatov, regarding possible violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* ("IEEPA"), as well as money laundering offenses under 18 U.S.C. §§ 1956 and 1957, relating to your client's acquisition, sale, rental, or maintenance of the M/Y *Amadea*. Based on the information that the Department has learned to date, the Department has closed its criminal investigation of your client in this matter. This letter is limited to your client and is not applicable to any other person or entity. If the Department learns of additional information, it may reopen its investigation.
>
> Sincerely,
>
> */s/ Michael W. Khoo*
> Michael W. Khoo
> Co-Director, Task Force KleptoCapture
>
> */s/ David Lim*
> David Lim
> Co-Director, Task Force KleptoCapture
>
> U.S. DEPARTMENT OF JUSTICE

Given the closure of this investigation, the government has now acknowledged that it cannot prove the legal basis it used to seize the Amadea, and thus has no basis to

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

forfeit it. Under these circumstances, even if the seizure was lawful, Mr. Khudainatov is presumed to have the right to the return of his property.

But the seizure was not lawful. This memorandum details how the government used a flawed theory set forth in a knowingly false and misleading affidavit signed by Federal Bureau of Investigation ("FBI") Special Agent Timothy Bergen in support of its request for a seizure warrant (the "Bergen Affidavit").[1] The theory in the Bergen Affidavit is that Mr. Khudainatov sold the Amadea to a sanctioned individual, Suleiman Kerimov, in August 2021, and that Mr. Khudainatov became the straw owner to conceal Kerimov's ownership. But this sale never happened (Mr. Khudainatov and Kerimov do not even know each other) and Kerimov does not own the vessel, as Kerimov has asserted publicly.[2] In support of this theory, the government falsely claimed that crew members said Kerimov owned the vessel, when in fact, these crew members said nothing of the sort and, in any event, would not have the basis for knowing the identity of the owner. The government then relied on an internal change in corporate structure resulting in a new certificate of ownership being filed, and vague marketplace rumors based on this change, as evidence of a sale that simply never occurred.

The Amadea is, in fact, owned by Petitioner Millemarin Investments Ltd. ("Millemarin"), which is beneficially owned by Mr. Khudainatov, who is not

---

[1] Two Affidavits of Timothy Bergen have been filed relating to the Amadea: one in the United States dated April 13, 2022, which is redacted, and one in Fiji dated April 22, 2022, which is not redacted. Based on length and number of paragraphs, they appear to be substantially similar to one another. Mentions of the "Bergen Affidavit" in the text refer collectively to both versions, unless the reference is only to the "U.S. Bergen Affidavit." Citations to the Fiji version will be "Bergen Aff." Citations to the U.S. version will be "U.S. Bergen Aff."

[2] Aleksandra Ippolitova, *The Yacht Amadea, Allegedly Belonging to Senator Kerimov, was moved to Hawaii*, GAZETA.RU (June 20, 2022) https://perma.cc/YF6U-XU8R.

sanctioned in the U.S. This fact alone destroys any probable cause to seize it. Given that the Amadea was not sold to a sanctioned individual, as a matter of law, the Amadea was not part of any criminal scheme, and therefore was not "involved in" a transaction in violation of 18 U.S.C. § 1956, nor could it "constitute" "proceeds traceable" to a specified unlawful activity; as such, it is not subject to forfeiture. Therefore, the original seizure of the Amadea was wholly improper, and its continued possession of the vessel is *ultra vires*.

Petitioners' counsel undertook every effort to avoid litigation, but, despite more than a year of discussions during which Petitioners demonstrated to the DOJ that its theory was wrong, the government has refused to return it, forcing Petitioners to file this motion. The reason is obvious: the seizure was political theater, and not based on a proper and fulsome investigation. Following the Russia-Ukraine conflict, the Amadea was targeted by the U.S. government because of its size, opulence, and Russian ownership, and not because of any evidence it was involved in wrongdoing. The Constitution only permits the government to seize property—even property owned by non-Americans—if it can establish probable cause that the property was involved in criminal activity. No such probable cause existed here. Even assuming *arguendo* that the government could have made that showing, the only alleged violations of law in the Bergen Affidavit involve a handful of payments to vendors for the Amadea on behalf of a sanctioned individual. Therefore, at most, the government would perhaps be entitled to forfeit tens of thousands of dollars, not a $330 million vessel.

The government's wrongful seizure of the Amadea is troubling for another reason: it has cost American taxpayers millions of dollars, as the vessel's maintenance costs approximately $1 million a month. Mr. Khudainatov has offered to pay these costs while the vessel has been in U.S. custody to ensure that its value is maintained. But the government has not accepted this offer, instead saddling

American taxpayers with these costs. Mr. Khudainatov also offered to pay several hundred thousand dollars' worth of outstanding invoices for vendors who provided ordinary and lawful services to the vessel prior to it being seized, but the government has prohibited these payments too, leaving non-Russian small business owners, including American citizens, uncompensated for their services.

The government has now all but conceded that the false and misleading allegations set forth in the Bergen Affidavit cannot be proven, and yet the government refuses to release the Amadea. Petitioners respectfully request that the Court release the vessel to its owner, Mr. Khudainatov, pursuant to Federal Rule of Criminal Procedure 41(g). Because the motion is submitted when no criminal proceedings are pending, the instant filing, while titled as a motion, is to be treated by this Court as a Complaint.[3] *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993); *see also United States v. Ibrahim,* 522 F.3d 1003, 1007-1008 (9th Cir. 2008). Although motions brought under this rule only require a balancing of the equities in order for the court to exercise jurisdiction, here, all four relevant factors, determined in *Ramsden*, 2 F.3d at 324, weigh in Mr. Khudainatov's favor: (A) the government displayed a callous disregard for the Fourth Amendment's probable cause requirement; (B) Mr. Khudainatov has an individual interest in and need for the property; (C) he would be irreparably injured by denying return of his property; and (D) he does not have any other adequate remedy at law for the redress of his grievance. Mr. Khudainatov also requests a *Franks* hearing to address the false witness statements included in the Bergen Affidavit. With the investigation now closed, the government cannot claim any evidentiary need for the vessel or a legal basis to forfeit it, and Petitioners respectfully request that the Court order the government to return it.

---

[3] Because the instant motion is to be treated as akin to a civil complaint, this filing is greater than the 25-page limit afforded to memorandums.

4

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

## STATEMENT OF FACTS

### I.   THE MOTOR YACHT AMADEA

The Amadea is a 348-foot motor yacht, longer than a football field. The vessel accommodates 16 guests and 40 crew members,[4] and has a range of 8,000 nautical miles, which allows it to cruise between continents. The Amadea carries 392,000 liters of fuel on board, and 77,000 liters of water. It is a large, heavy, and highly complex floating building with sophisticated and idiosyncratic systems. It requires a crew with specialized knowledge trained to man this particular vessel to ensure that it does not needlessly depreciate in value, but more importantly that it is kept in the safest condition possible in order to avoid what could result in an environmental disaster should the vessel catch fire or sink.

Mr. Khudainatov commissioned the building of the Amadea in 2012 and has been its ultimate beneficial owner ("UBO") ever since. While he began his life in poverty in what is currently Kazakhstan, due to his business acumen and workaholic nature, he has amassed significant wealth over his more than forty-year career.[5] His investments include over $1 billion in megayachts alone, a fraction of his overall

---

[4] The crew's leader is the Captain, who oversees the Purser (who manages the yacht's finances), and five department heads: Chief Officer, Head of Security, Chief Engineer, Head Chef, and Chief Stewardess. Each department head oversees others in positions such as security and navigation officers, deckhands, engineers and motormen, kitchen staff, servers, and housekeepers.

[5] Mr. Khudainatov began his career installing oil rigs in a remote Siberian city. After working his way up, he became a successful businessman and leader in the oil and gas sector, including at Rosneft, Russia's state-owned oil company. He left Rosneft to create Independent Oil and Gas Company ("NNK"), which has grown from thirty employees to more than 30,000 over the past decade. NNK has sold billions of dollars in assets, bringing significant revenues to Mr. Khudainatov personally as the sole shareholder.

wealth. Mr. Khudainatov has never been sanctioned by the U.S. or U.K.[6] He was not included by the U.S. Department of the Treasury on the list it submitted to Congress in 2018,[7] which included senior political figures, "oligarchs"[8] and certain entities. Nor has the U.S. put forth any evidence that Mr. Khudainatov's wealth resulted from any nefarious activity, let alone activity that would violate U.S. law. In addition, Mr. Khudainatov is not aware of ever having met Suleiman Kerimov, the sanctioned individual for whom he is allegedly fronting as the straw owner of the Amadea.

### A.   Mr. Khudainatov commissioned the building of the Amadea.

Mr. Khudainatov is a long-time boating enthusiast. In the past, he has owned and chartered smaller yachts, typically 30 meters in length. In 2011, he commissioned his first megayacht, which became the Amadea, relying heavily on the expertise of a yacht management company, whose founder he came to know

---

[6] Only after false allegations emerged that Mr. Khudainatov was a straw owner of vessels was he sanctioned by the European Union on June 3, 2022. 2022 O.J. (L 153) No. 1173, p. 43 of 143, available at https://perma.cc/S2SF-VJYE. In 2017, two of his companies in Russia were sanctioned by the U.S. for allegedly doing business with North Korea. The companies successfully petitioned the Office of Foreign Assets Control ("OFAC"), however, and OFAC admitted its error and removed them from the SDN list as of March 2, 2020.

[7] U.S. DEP'T OF TREASURY, Report to Congress Pursuant to Section 241 of the Countering America's Adversaries Through Sanctions Act of 2017 ("CAATSA") Regarding Senior Foreign Political Figures and Oligarchs in the Russian Federation and Russian Parastatal Entities (2018), available at https://perma.cc/7QC3-YK7A.

[8] The term "oligarch" is not defined in the CAATSA or in any other U.S. law or regulation. With respect to Russians, the term has commonly been understood to refer to individuals who benefited from the privatization of state-run industries after the collapse of the Soviet Union in the 1990s. CAMBRIDGE DICTIONARY, https://perma.cc/82N9-23QB (last visited Oct. 22, 2023). Mr. Khudainatov did not amass his wealth through the privatization of state-run industries in the 1990s, and therefore is not an "oligarch."

and trust. On February 24, 2012, Mr. Khudainatov entered into a Shipbuilding Agreement with Lürssen Shipyards, a highly regarded German shipbuilder, to build the Amadea. Prior to entering into that contract, Mr. Khudainatov caused the creation of an entity called Nereo Management Limited ("Nereo") on February 13, 2012, to act as the buyer in the Shipbuilding Agreement with Lürssen.

Mr. Khudainatov paid €212,824,677 for the Amadea in multiple installments between 2012 and 2017. During the Amadea's construction, which took five years, Mr. Khudainatov was heavily involved in the design process, and hand-selected many design elements to reflect his personal vision and style, with an eye towards possibly selling the vessel. The Amadea was completed and delivered in 2017.

Mr. Khudainatov built the Amadea not only to use it himself, but also because of the prospect of making large profits from selling the vessel. As yachts of this nature take several years to build, there is a strong resale market for buyers who do not want to wait that long to own a new yacht.[9] Mr. Khudainatov put the Amadea on the market in 2018, but due to its unique style and the COVID pandemic, it never sold.

### B. Mr. Khudainatov transferred the Amadea's ownership from Nereo to Millemarin, and remained the UBO.

On August 16, 2021, Mr. Khudainatov transferred the owning company of the Amadea from Nereo to Millemarin, but he remained the Amadea's UBO. Mr. Khudainatov incorporated Millemarin to be the new holding company for the

---

[9] Indeed, as was widely-reported in the press at the time, Russian businessman Yuri Shefler sold a superyacht after using the vessel himself and chartering it to others at a profit of at least $150 million. Peter, *SERENE Yacht • Fincantieri • 2011• Owner Yuri Shefler*, SUPERYACHTFAN (last visited Oct. 22, 2023), https://perma.cc/MWA8-D2B7; *see also* Mark Mazzetti & Ben Hubbard, *Rise of Saudi Prince Shatters Decades of Royal Tradition*, N.Y. TIMES (Oct. 15, 2016), https://www.nytimes.com/2016/10/16/world/rise-of-saudi-prince-shatters-decades-of-royal-tradition.html?_r=1.

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

Amadea. He effectuated this transfer for his personal wealth and estate planning purposes. After the transfer, Millemarin (and the Amadea) became an asset of Mr. Khudainatov's trust called the September Trust, of which he is the named beneficiary. The day of the transfer, the Amadea's management company, which facilitated the transfer, notified Mr. Khudainatov's office that the transfer from Nereo to Millemarin was complete, and made clear that he continued to be the financially responsible party for the Amadea. Notably, the transfer from Nereo to Millemarin was not accompanied by any of the typical markers of a sale to a third-party, and there is no evidence that this transfer was a sale to Kerimov, as the Bergen Affidavit claims.

After the ownership of the Amadea was transferred from Nereo to Millemarin, Mr. Khudainatov continued to push his brokers to sell the Amadea. He instituted a strategy, frequently used for selling real estate that has been on the market for a long time, to take the vessel off the mass viewing market to prevent the drain of the yacht's perceived market value after being publicly marketed for so long.

### C.  Amadea's management considered charter requests, including a long-term charter for a single client.

In the fall of 2021, as sales efforts continued, Mr. Khudainatov agreed to let the Amadea's yacht management company offer the Amadea for charters. In the COVID environment, many prospective charterers were interested in traveling to more remote destinations for longer periods of time. One such person who was interested in this type of charter was Gulnara Kerimova, Kerimov's adult daughter who was not sanctioned at the time. Ms. Kerimova had previously chartered similar yachts, not owned by Mr. Khudainatov.

As her preferred megayacht was unavailable for long-term charters, Ms. Kerimova chartered the Amadea. On September 21, 2021, Ms. Kerimova signed an

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

agreement to charter the Amadea from January 14 to February 16, 2022, for €5 million.[10] That charter agreement included the provision that "the Owner is giving for free as a sea trial 3 days in October in any location at the Owner's expense according to vessels [sic] schedule." The charter agreement also confirmed Ms. Kerimova's intention to charter the Amadea for 20 weeks during 2022-2023 for approximately €900,000 per week plus expenses. Notably, the charter to Ms. Kerimova occurred *after* the government claims her father purchased the vessel. Had her father purchased the vessel, she would not have had to charter it through the Amadea's yacht management company.

Ms. Kerimova completed the sea trial in October 2021 and took the January-February 2022 charter trip, consistent with the September 2021 charter agreement. Her father was not present during these trips. During Ms. Kerimova's trips on the Amadea, the crew referred to the guests with "G" code names, such as G1, G2, and G3. This is common in the industry, as guests often prefer confidentiality, and it is a shorthand way for the crew to communicate with one another about the guests without having to remember names. The use of "G" codes does not suggest ownership of a vessel, as "G" codes are used regardless of whether the owner is using the vessel or a charter guest is chartering the vessel.

### D.     After the long-term charter, the Amadea was heading to the Philippines for five weeks of planned maintenance.

After Ms. Kerimova's early 2022 charter, the Amadea sailed from the Caribbean, through the Panama Canal, up the coast of Mexico for refueling before setting sail across the Pacific Ocean. The vessel arrived in Fiji on or about April 12, 2022, where it was seized by the U.S. government. The vessel was scheduled to

---

[10] At the time she signed this charter agreement, Ms. Kerimova had been vetted and approved to pay for this charter with her own funds by outside counsel for the Amadea's management company and charter broker, and had also been previously vetted by her own yacht broker, Burgess.

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

leave Fiji and head to the Philippines for approximately five weeks of maintenance and repairs. These destinations were planned months in advance.

## II. THE POLITICAL BACKGROUND LEADING TO THE AMADEA'S SEIZURE

On February 24, 2022, Russia began its special military operation in Ukraine and President Biden immediately responded by announcing that the U.S. would begin seizing the assets of wealthy Russians in the hope that these individuals would pressure Russian President Vladimir Putin to withdraw from Ukraine. Just days after the war's start, in his State of the Union address on March 1, 2022, President Biden outlined actions that the U.S. would be taking in response:

> Tonight, I say to the Russian oligarchs and the corrupt leaders who've bilked billions of dollars off [Putin's] violent regime: No more. . . .
> The United States Department of Justice is assembling a dedicated task force to go after the crimes of the Russian oligarchs.
> We're joining with European Allies to find and seize their yachts, their luxury apartments, their private jets. We're coming for your ill-begotten gains.[11]

The next day on March 2, 2022, U.S. Attorney General Merrick Garland announced the launch of Task Force KleptoCapture (the "Task Force"), "an interagency law enforcement task force dedicated to enforcing the sweeping sanctions, export restrictions, and economic countermeasures that the United States has imposed, along with allies and partners, in response to Russia's unprovoked military invasion of Ukraine," actions "designed to isolate Russia from global markets and impose serious costs for this unjustified act of war, by targeting the crimes of Russian officials, government-aligned elites, and those who aid or conceal their unlawful conduct." The Task Force's stated mission includes prosecuting sanctions violations and "[u]sing civil and criminal asset forfeiture authorities to

---

[11] *President Biden's State of the Union Address,* THE WHITE HOUSE (Mar. 1, 2022), https://perma.cc/Z8Y2-9NUH.

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

seize assets belonging to sanctioned individuals or assets identified as the proceeds of unlawful conduct."[12]

On March 7, 2022, a YouTube channel named "eSysman SuperYacht News" posted a video on YouTube entitled, "Superyacht disappears the day of Russian invasion of Ukraine Ep49 SY News."[13] Without any sourcing, the YouTuber stated that while the Amadea's "ownership [wa]s steeped in mystery," the vessel was currently owned by sanctioned "Russian billionaire" Suleiman Kerimov. He also stated that the Amadea's AIS had been turned off "for 11 days" starting on "the day of the invasion of Ukraine." These statements were false.

This video got picked up by news outlets and its allegations were repeated in articles published on the internet. The video also went viral among the crew, some of whom expressed concern and asked the Captain if the owner of the Amadea was sanctioned. In addition, around this time, about a week after President Biden's pronouncement, vendors of the Amadea began asking for confirmation that the owner was not sanctioned. While the Captain knew that Mr. Khudainatov was the owner, he needed documents confirming as such. As a result, the Captain asked the Amadea's yacht management company for those documents.

In response, on March 8, 2022, a representative from the yacht management company sent an email to the Amadea's Captain that explained that Mr. Khudainatov owned the Amadea through the holding company Millemarin, which was held in Mr. Khudainatov's trust. Corroborating documents demonstrating Mr. Khudainatov's ownership of the Amadea were attached to the email.

---

[12] *Attorney General Merrick B. Garland Announces Launch of Task Force KleptoCapture*, U.S. DEP'T JUST. OFF. PUB. AFFS. (Mar. 2, 2022), https://perma.cc/E286-7ZEC.

[13] eSysman SuperYachts, *Superyacht disappears the day of Russian invasion of Ukraine Ep49 SY News*, YOUTUBE (Mar. 7, 2022), https://www.youtube.com/watch?v=F-1P8JafKO0.

Just three weeks after the eSysman video, on April 1, 2022, the government submitted a request for assistance to the Republic of Fiji seeking interviews of crew members and documents on board the Amadea. By this date, the government was pursuing a theory that the vessel was owned by Kerimov, upon information and belief, based on the rumors started by eSysman.

The Amadea arrived in Fiji on April 12, 2022. That day, the FBI and other authorities interviewed three crew members at Los Angeles International Airport ("LAX"): a Captain, a Chief of Security, and a Chief Officer, who were on their way to Fiji to relieve their counterparts.[14] After these individuals refused to say that Kerimov was the owner of the Amadea, law enforcement authorities revoked their visas to enter the U.S. The authorities claimed that the crew members' refusal to name Kerimov as the Amadea's owner and refusal to state that the Amadea was heading to Russia constituted material misstatements of fact.

Late on April 12, 2022 (early morning of April 13, 2022 Fiji time), the FBI and Fijian authorities interviewed five crew members from the Amadea in Fiji: the other Captain, the Purser, the other Chief Officer, an Officer of the Watch, and the other Chief of Security.[15] After his interview, the Captain provided to the authorities the documents demonstrating Mr. Khudainatov's ownership of the Amadea that he had received on March 8. According to these crew members, none of them identified Kerimov as the owner of the Amadea:

---

[14] The Amadea had two sets of crew members, i.e., two Captains, two Chief Officers, and so on. This permitted each crew member to rotate two-month shifts with their counterpart or "back-to-back." For example, while one Captain worked two months, his "back-to-back" had those two months off.

[15] In an effort to induce these individuals to make untruthful claims that fit the government narrative, U.S. law enforcement authorities falsely told all five of them that three "employees" of the Amadea's management company at LAX had already admitted that Kerimov owned the vessel and they had tampered with documents to conceal Kerimov's identity as the Amadea's owner.

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

- the Captain said that Kerimov was not the UBO of the Amadea;

- the Chief of Security said he believed, but did not have first-hand knowledge, that Mr. Khudainatov was the owner of the vessel;

- the Chief Officer said he did not know who owned the Amadea, but understood that it was the same gentleman who had always owned it;

- the Purser stated that the owner of the Amadea was Millemarin, but she did not know who owned Millemarin; and

- the Officer of the Watch said that he did not know who owned the Amadea.

The responses of all crew members who were interviewed by the authorities were truthful. On the Amadea, as is typical of other megayachts, only the Captain and the Purser were aware of the entity, Nereo and then Millemarin, that owned the vessel. The Captain maintained on board the Certificate of British Registry that identified Nereo and later Millemarin as the owner of the Amadea. The Purser received invoices that identified Millemarin as the financially responsible party. The rest of the crew, however, would not have had any reason to have first-hand knowledge of the UBO, Mr. Khudainatov.

### III.  THE APPLICATION FOR THE SEIZURE WARRANT

On the heels of these interviews, the government applied for a seizure warrant. In support of its Application for a Warrant to Seize Property Subject to Forfeiture, the government filed the Affidavit of FBI Special Agent Timothy J. Bergen, in the United States District Court for the District of Columbia on April 13, 2022.[16]

---

[16] While this version of the Affidavit is redacted, the theory the government relied on to seize the Amadea is set forth in contemporaneous publicly available filings in last year's Fiji litigation. Just after the Seizure Warrant was authorized in the U.S., the government sent an urgent "Supplemental Request for Assistance" (the "U.S.

In his affidavit, Bergen, who then had only four years of experience with the FBI and no experience relevant to this matter, concluded that Kerimov purchased the Amadea in August 2021 and that Mr. Khudainatov served as Kerimov's straw owner, and that Kerimov afterwards caused U.S. dollar transactions to support the operation of the vessel.[17] Specifically, he swore to this belief based on the following:

- unnamed "members of the yacht brokerage community" who "believe[d]" that the Amadea was sold to Kerimov in or about 2021, Bergen Aff. ¶ 26;

- Kerimov had previously toured the Amadea, Bergen Aff. ¶ 26(b);

- a name change in the ownership of the Amadea on August 16, 2021, Bergen Aff. ¶ 27, U.S. Bergen Aff. ¶ 32;

---

Request"), dated April 13, 2022, the same date of the U.S. Bergen Affidavit. Fewer than ten days later, an unredacted Bergen Affidavit was filed in Fiji, and based on its length appears to be substantially similar to the U.S. Bergen Affidavit. The arguments made herein are based on the allegations in the Fiji version and the U.S. Request, unless otherwise noted. The government refused Petitioners' request for a copy of the unredacted U.S. Bergen Affidavit, and respectfully request that this Court order the government to produce it.

[17] According to the U.S. Bergen Affidavit, Bergen did not have any experience with the alleged crimes, including sanctions evasion, money laundering, or asset seizure or forfeiture matters, or any experience with the megayacht industry or the finances of Russian billionaires. Despite his lack of experience, Bergen concluded that Mr. Khudainatov was a straw owner for Kerimov. Mere conclusions like these by an affiant are insufficient to establish probable cause, particularly where the affiant, like Bergen, fails to "explain the nature of his expertise or experience and how it bears upon the facts" leading to the conclusions. *United States v. Cervantes*, 703 F.3d 1135, 1139–1140 (9th Cir. 2012) (citations omitted) (finding that the district court erred when it held that the search at issue was based on probable cause, as "a general claim of expertise will not suffice"); *see also Illinois v. Gates*, 462 U.S. 213, 239 (1983) (finding that "wholly conclusory statement[s]" in a warrant affidavit are inadequate because they give the magistrate no basis to make a judgment regarding probable cause).

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

- the Amadea's yacht broker said in July 2021 that it was available for viewing, but said in October 2021 that it was no longer available for viewing, Bergen Aff. ¶ 28;

- "multiple" unnamed crew members who "identified" Kerimov as the owner of the Amadea, Bergen Aff. ¶ 34(a);

- members of Kerimov's family took trips on the Amadea, and code names were used for them during these trips, Bergen Aff. ¶¶ 34(a)-(d), 35(b)-(d);

- members of Kerimov's family scheduled a Caribbean trip for early 2022 and discussed a travel agenda for later in 2022 and 2023, and requested modifications to the yacht, Bergen Aff. ¶¶ 35(e)-(h); and

- the Amadea sought to evade detection by turning off its AIS, and was heading to Russia. Bergen Aff. ¶¶ 36, U.S. Bergen Aff. ¶¶ 43, 59.

Bergen concluded that Mr. Khudainatov was a straw owner for Kerimov to conceal Kerimov's ownership. In support of that erroneous claim, Bergen stated that Mr. Khudainatov was not wealthy enough to own two yachts because, in part, he was not included on the 2022 *Forbes* billionaires list.[18] Bergen Aff. ¶¶ 31-33. And Bergen claimed that the March 8 documentation demonstrating Mr. Khudainatov's ownership of the Amadea was part of the scheme to conceal Kerimov's ownership. Bergen Aff. ¶ 29.

Bergen then listed invoices relating to the Amadea that were addressed to Millemarin, and payments made on behalf of the Amadea, but with no evidence that any payments were made by or in any way connected to Kerimov. Bergen Aff. ¶¶ 29, 40; U.S. Bergen Aff. ¶ 48. Nevertheless, Bergen stated that Kerimov caused payments to be made through U.S. financial institutions or in U.S. dollars on behalf

---

[18] A magazine's list should not be the basis of, or suffice as evidence for, any U.S. government enforcement action.

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

of the Amadea. Bergen Aff. ¶¶ 38-43. The Bergen Affidavit concluded that there was probable cause to believe that Kerimov committed sanctions evasion pursuant to 50 U.S.C. § 1705(a) ("IEEPA"), and money laundering and conspiracy pursuant to 18 U.S.C. §§ 1956(a)(2) & (h), rendering the Amadea subject to seizure and forfeiture, as it was either "involved in" a money laundering transaction under § 1956 or "constitutes" "proceeds traceable" to sanctions violations under IEEPA. *Id.*; U.S. Bergen Aff. ¶¶ 5, 18-22, 54-57.

The Bergen Affidavit also falsely claimed a need for exigency. U.S. Bergen Affidavit ¶ 59. Bergen asserted that while paperwork showed that the Amadea's next destination was the Philippines, there was "reason to believe" that it was heading to Russia. *Id.* Bergen asserted that many sanctioned oligarchs made efforts to move their yachts to Russia or other safer jurisdictions, and that the route taken by the Amadea suggested that it "may" have been doing the same. *Id.* Bergen's "reason to believe" was baseless.

It was upon this application that U.S. Magistrate Judge G. Michael Harvey authorized the warrant ("Seizure Warrant") the day it was filed, April 13, 2022. Armed with that warrant, the U.S. asked the Fijian authorities to give effect to the Seizure Warrant and serve it on the Amadea, by sending an urgent "Supplemental Request for Assistance in the Investigation of" Kerimov (the "U.S. Request").

## IV.   POST-SEIZURE EVENTS

The U.S. sought to effectuate the Seizure Warrant on the Amadea in Fiji. Kerimov was named in the Fiji court action, but he never appeared or claimed any interest in the vessel. Petitioners, however, intervened in the Fiji court action as the owners from the outset and challenged the seizure. The Fiji Supreme Court ultimately permitted the U.S. to take the Amadea from Fiji. On June 7, 2022, U.S. authorities sailed the Amadea from Fiji to San Diego, California, where the vessel has remained ever since.

The DOJ has been parading the Amadea around as the poster child of President Biden's policy. Upon its seizure, the DOJ issued a press release in which the Attorney General declared, "there is no hiding place for the assets of individuals who violate U.S. laws . . . [a]nd criminals who enable the Russian regime," and that the DOJ would be "relentless in [its] efforts to hold accountable those who facilitate the death and destruction we are witnessing in Ukraine."[19] Weeks later, a DOJ official publicly stated, "Let's get to the juicy stuff: the yachts. . . . We recovered a Fabergé—or alleged Fabergé egg—on [the Amadea], so it just gets more and more interesting."[20] There was never a Fabergé egg on the Amadea. Further, another DOJ official publicly claimed that after the war started, the Amadea "tried to go dark." However, this statement was knowingly false: publicly available GPS trackers for the vessel prove that the Amadea never went dark. The DOJ's claims appear calculated to legitimize its wrongful seizure.

For the past year and a half, the vessel has been sitting idle in the waters of San Diego, while U.S. taxpayers have shelled out millions of dollars for its upkeep. The government, via the U.S. Marshals Service, is required to maintain custody and control management of the Amadea, including safeguarding and preserving its value.[21] The Amadea requires daily, weekly, monthly, and annual maintenance and servicing, and without it, the seaworthiness and safety of the vessel, the crew, and the area where it is located is compromised. Not only has the vessel depreciated in value during this time, but its current condition is unknown to Petitioners. And the

---

[19] *$300 Million Yacht of Sanctioned Russian Oligarch Suleiman Kerimov Seized by Fiji at Request of United States*, U.S. Dep't Just. Off. Pub. Affs. (May 5, 2022), https://perma.cc/HV3Q-AQH2.

[20] The Aspen Institute, *The New Russian Empire?*, YouTube (Jul. 20, 2022), https://www.youtube.com/watch?v=iRPSYBmv5yQ&t=3644s (1:04:42-1:06:35).

[21] 28 C.F.R. § 0.111(i); *see also* Asset Forfeiture Policy Manual (2023) Chap. 1, Sec. I. A, Chap. 2, Sec. II. A, Chap. 10, Sec. I. A.

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

government has refused to provide Petitioners with detailed reports of the Amadea's condition and the maintenance the vessel has received since in U.S. custody.

On September 28, 2023, the government notified Petitioners that it had closed its criminal investigation of Mr. Khudainatov regarding the Amadea, essentially admitting its inability to prove the allegations in the Bergen Affidavit. And yet, the government continues to hold the Amadea without any legal basis to do so. Petitioners have no other recourse than to file this action to seek the return of the Amadea to its rightful owner, Mr. Khudainatov.

## ARGUMENT

## I. PETITIONERS SATISFY THE *RAMSDEN* FACTORS; THIS COURT SHOULD EXERCISE ITS EQUITABLE JURISDICTION

The government has seized the Amadea, but has not initiated any proceedings to provide its owner any due process, and has recently closed its investigation of Mr. Khudainatov relating to the Amadea. Under these circumstances, a motion pursuant to Federal Rule of Criminal Procedure 41(g) is the proper vehicle for Petitioners to seek the return of the Amadea. *Ramsden v. United States*, 2 F.3d 322, 324 (9th Cir. 1993) ("[D]istrict courts have the power to entertain motions to return property seized by the government when there are no criminal proceedings pending against the movant."); *United States v. Martinson*, 809 F.2d 1364, 1369-70 (9th Cir. 1987). Federal Rule of Criminal Procedure 41(g) provides:

> MOTION TO RETURN PROPERTY. A person aggrieved by an unlawful search and seizure of property . . . may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Where, as here, the government has closed its investigation of Mr. Khudainatov relating to the seized property, the owner of the property is presumed

to have a right to its return, regardless of whether the original seizure was lawful. *Martinson*, 809 F.2d 1364, 1369-70. However, as demonstrated below, the seizure was unlawful, which also demonstrates that the government has no factual or legal basis upon which to seek forfeiture of the vessel.

Rule 41(g) filings are considered the same as a civil action in equity. *Ramsden*, 2 F.3d at 324; *see also Ibrahim*, 522 F.3d at 1007-1008 (finding that when no criminal proceedings are pending, the district court is to treat a Rule 41(g) motion as a civil complaint and not as a motion for summary judgment); *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).[22] In deciding whether to exercise equitable jurisdiction in these matters, the Ninth Circuit considers four factors referred to as the "*Ramsden* Factors": (A) whether the government displayed a callous disregard for the constitutional rights of the movant; (B) whether the movant has an individual interest in and need for the property he wants returned; (C) whether the movant would be irreparably injured by denying return of the property; and (D) whether the movant has an adequate remedy at law for the redress of his grievance. *Ramsden*, 2 F.3d at 325. The Court is only required to find that the "balance of equities tilts in favor of reaching the merits" of the Rule 41(g) motion; in such instances, the district court should exercise its equitable jurisdiction to entertain the motion. *Ramsden*, 2 F.3d at 326 (even where one of the four factors was not met (irreparable harm), the district court did not abuse its discretion in exercising its equitable jurisdiction). Here, the balance of equities clearly tilts in favor of Petitioners, giving this Court equitable jurisdiction over this matter.

---

[22] As this Court is required to treat this motion as a civil complaint, Petitioners have not set forth every fact in support of their requested relief, and have not submitted evidence, and reserve the right to do so as this case proceeds.

19

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

**A.    The government callously disregarded the Fourth Amendment by seizing the vessel based on a false and misleading affidavit.**

The Fourth Amendment to the United States Constitution requires warrants to be based on a finding of probable cause. U.S. Const. amend. IV. The government here callously disregarded this constitutional requirement by filing an affidavit to obtain the Seizure Warrant based on false and misleading statements that were material to the finding of probable cause. The government also likely omitted available exculpatory facts, which would reveal the lack of probable cause.

Specifically, the Bergen Affidavit:

- includes materially false statements (and likely omits exculpatory statements) as to what witnesses told investigators about the yacht's ownership (the central issue in the case);

- relies on persons who, as the government should have known, did not have reliable or first-hand knowledge of ownership;

- presents certain facts as evidence of ownership although the government knew or should have known (based on yachting industry practice) that these facts did not establish ownership;

- draws unsupported conclusions based on the affiant's "training and experience," without establishing the affiant's qualifications to draw such conclusions (Bergen does not have any experience with sanctions cases or the yachting industry);

- fails to link any payment related to the Amadea to Kerimov; and

- falsely states that the Amadea was seeking to evade detection after the conflict in Ukraine started, when the government knew or should have known that the Amadea was publicly trackable during this time.

By filing the Bergen Affidavit in this way, the government either knowingly presented false statements and omitted material evidence that contradicted their

20

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

chosen conclusion, or were reckless in failing to ensure that the facts relied upon equated to evidence of ownership. Once the "evidence" put forth by the government in its request for the Seizure Warrant is placed under even the slightest scrutiny, the theory that Kerimov owns the Amadea disintegrates, as does the ability to establish probable cause that *any* crime was committed justifying the seizure or forfeiture of the Amadea.

### 1. The Bergen Affidavit includes falsified witness statements.

The Bergen Affidavit states that "[m]ultiple crew members identified Kerimov as the true owner of the AMADEA . . . ." Bergen Aff. ¶ 34(a). Petitioners submit that this is an outright falsehood, and Bergen's misstatements on this point could not have been inadvertent.

Brief summaries of the crew member interviews are set forth in the U.S. Request, which the DOJ submitted to Fijian law enforcement seeking Fiji's legal assistance in this matter.[23] These five crew members took contemporaneous notes of what they said during these interviews, and the notes of at least two of these crew members do not align with the government's summaries. According to the government's summaries, one crew member supposedly said that he "understood" Kerimov to be the owner, while another supposedly said that Kerimov bought the Amadea in the fall of 2021 in a "backdoor Russian deal." According to the crew member notes, however, not one crew member said Kerimov owned the vessel.

Rather, the notes show that one crew member unambiguously denied that Kerimov was the UBO of the Amadea (the Captain). And two others denied knowing who the UBO was (the Purser and the Officer of the Watch).

The remaining two crew members told the government that they believed that Mr. Khudainatov (or the man who had always owned the vessel) was the owner (the

---

[23] Notably, it does not appear that the U.S. Request was provided to the U.S. magistrate judge as part of the application for the Seizure Warrant.

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

Head of Security and the Chief Officer). Remarkably, the government's summaries are consistent with the crew members' notes on this point, that two crew members identified Mr. Khudainatov as the Amadea's owner, but this information was not included in the Bergen Affidavit filed in Fiji, and likely not included in the version filed in the U.S.

In sum, not one of these witnesses told the authorities that Kerimov owned the vessel, and in fact two crew members identified Mr. Khudainatov as the owner. If the U.S. Bergen Affidavit relies in any way on one or more crew members saying that Kerimov owned the Amadea, and/or omits the exculpatory statements of the other two crew members who identified Mr. Khudainatov as the Amadea's owner, this Court should invalidate the Seizure Warrant. *Franks v. Delaware*, 438 U.S. 154, 156 (1978).

To the extent that two crew members said anything close to what the government claimed in the U.S. Request (that the vessel was owned by Kerimov), the only reasonable explanation is that any such belief was based on rumors that were spreading at that time. For example, the eSysman video, which was published in early March, had spurred press reports repeating the falsehood that Kerimov owned the vessel. Even if a crew member erroneously identified Kerimov as the owner—which is not reflected in their contemporaneous notes—at best they were simply repeating what they had heard or read on the internet, rather than speaking from any first-hand knowledge. The investigators either failed to probe the basis of their purported statements, or intentionally excluded from the Affidavit the fact that they knew these witnesses were simply repeating unverified rumors. This can only be described as callous disregard for the facts and the law. *See In re Search Warrants Served on Home Health & Hospice Care, Inc.*, No. 96-4813, 1997 WL 545655, at *1, *7 (4th Cir. 1997) (affirming the district court's order to return seized property based, in part, on a finding that federal agents re-worded a witness

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

statement to attribute knowledge to that witness when in fact the witness told the agents he did not possess such knowledge); *United States v. Cortina*, 630 F.2d 1207, 1213 (7th Cir. 1980) (suppressing evidence where FBI agent deliberately included false witness statements in an affidavit); *United States v. Brown*, 631 F.3d 638, 649 (3d Cir. 2011) (holding that "a court may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it").[24]

> ## 2. The Bergen Affidavit relies on unidentified witness statements giving the false impression that the witnesses had a sufficient basis of knowledge.

The Bergen Affidavit presents the evidence of these crew member witnesses and others as if they would have had first-hand knowledge of the identity of the UBO of the vessel, when, in fact, they did not, and as a matter of industry standards would not. The Bergen Affidavit fails to identify any of the witnesses on which it relies and fails to explain why their statements should be credited.

It is common knowledge in the megayacht industry that crew members are often unaware of the identity of the UBO. Such was the case with the Amadea. Ultimate ownership information is typically kept confidential for legitimate purposes, such as a desire for privacy and security. These reasons have nothing to do with evading U.S. sanctions, let alone any U.S. law. In addition, vessels like the Amadea are typically owned by entities, like Millemarin, and not directly by individuals. And the ownership documentation kept on board—at least prior to the operation in Ukraine—would show the name of the owning entity, and not the UBO,

---

[24] While these cases were decided in the context of a *Franks* hearing where the issue was whether the affiant knowingly or recklessly disregarded the truth to establish probable cause in support of a search warrant, Petitioners submit that this standard should be considered analogous to whether the government callously disregarded the Fourth Amendment for purposes of a Rule 41(g) motion.

which was also the case with the Amadea. Only the Captain and the Purser would have access to the documents identifying the name of the owning entity. No crew member would typically have access to documents that identify the UBO of the owning entity. Thus, the fact that no documents were recovered from the Amadea that mentioned Mr. Khudainatov (except for the March 8, 2022 email demonstrating that he is the UBO) is consistent with standard operating procedures.

The Bergen Affidavit also relies on unspecified "members of the yacht brokerage community," who "believed" that the Amadea was sold to Kerimov. Bergen Aff. ¶ 26(b). These witnesses are similarly unidentified, and there is no explanation as to why their purported statements should be credited.[25] Summaries of these interviews in the U.S. Request do not provide any additional information. And just like the crew members, unless any of these witnesses had seen first-hand the documents that identify the UBO of Millemarin, these witnesses would have no first-hand knowledge of the identity of the Amadea's UBO.

Simply put, purported "beliefs" of unknown individuals do not constitute evidence, particularly where those unknown individuals would not have a basis for knowing the identity of the owner. Where the government asks a magistrate to credit the testimony of an anonymous informant, it is required to offer information such as that the informant is "known for the unusual reliability of his predictions" is "an

---

[25] Petitioners suspect that among these witnesses is a representative from Burgess, who served as the long-standing yacht broker to Kerimov and members of his family. Burgess, however, is untrustworthy. For example, after Gulnara Kerimova signed the charter agreement in September 2021, Burgess sent a letter to the Amadea's management company demanding a commission on a sale of the Amadea to Ms. Kerimova. Notably, after the government's theory that the vessel had been sold to Kerimov became public in the Fiji litigation, Burgess representatives demanded a commission again, but this time on the supposed sale to Kerimov in explicit reliance on the Fiji litigation, seeking to cash in on the rumor that they themselves relayed to law enforcement in the first place. Any witness from Burgess in this matter, therefore, is conflicted and unreliable.

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

unquestionably honest citizen," or provides an "explicit and detailed description of alleged wrongdoing." *Gates*, 462 U.S. at 233-34. Further, "[i]f an informant's tip is the source of the information, the affidavit must recite some of the underlying circumstances from which the . . . officer concluded that the informant . . . was credible or his information reliable." *Franks*, 438 U.S. at 165; *Cervantes*, 703 F.3d at 1139 ("[T]he conclusory allegation, without any foundational facts, was akin to an anonymous tip and, consequently, was entitled to little weight."). Neither the Bergen Affidavit nor the U.S. Request provides any of these facts or assurances. As such, these types of witness statements should lead a magistrate to disregard them and find probable cause lacking. *United States v. DeLeon*, 979 F.2d 761, 765 (9th Cir. 1992) (holding that no probable cause existed where the affidavit failed to establish citizen informant's qualifications or basis of knowledge for his assertions); *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985) (granting a *Franks* hearing, in part, because the affidavit failed to provide the witness's basis of knowledge that the defendant was engaging in criminal activity and "could very well have been reporting a casual rumor"); *United States v. Kolodziej*, 712 F.2d 975, 977 (5th Cir. 1983) (finding insufficient probable cause when witnesses provided conclusory statements without setting forth any facts demonstrating the witnesses' basis of knowledge or why these witnesses should be deemed reliable).

### 3. The Bergen Affidavit asserts certain facts as evidence of ownership, when the government knew they were not.

The Bergen Affidavit sets forth certain facts as if these facts were evidence of ownership when the government knew, or should have known, they were not. In doing so, the government either failed to consult disinterested experts about the yachting industry, or obtained that information and deliberately failed to include it in the Bergen Affidavit because it did not support its desired conclusion. In any

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

event, these facts should not be credited for purposes of establishing probable cause that Kerimov owns the Amadea.

First, the Bergen Affidavit relies heavily on the fact that Kerimov's adult daughter and her family took trips on the Amadea. Bergen Aff. ¶¶ 34(c)-(d), 35(b)-(f). It is undisputed that Gulnara Kerimova and her family chartered the Amadea for four weeks from January 14, 2022 to February 16, 2022 in the Caribbean, and that she tested the vessel for a few days during the previous October. It is also undisputed that Ms. Kerimova intended to charter the Amadea for 20 weeks during 2022-23. The October trial, the Caribbean trip, and the intention to charter the vessel for 20 weeks are all memorialized in a charter agreement between Ms. Kerimova and Millemarin, as brokered by the Amadea's yacht management company and broker. Finally, the government has set forth no evidence that Kerimov is connected in any way to the charterer Millemarin, the Amadea's owning company. Had Kerimov actually purchased the yacht, it follows that his adult daughter would not have had to charter the vessel, particularly from Mr. Khudainatov's broker. Thus, the fact that Ms. Kerimova chartered the vessel from an entity unconnected to her father is plain evidence that her father did not own the vessel.

In addition, the evidence—as acknowledged in the Bergen Affidavit—shows that Ms. Kerimova's father was not present on the vessel during her trips. In paragraph 35(b), the Affidavit states that emails refer to "Kerimov's daughters and son being aboard the AMADEA in January and February 2022," and includes their personal "preferences and habits aboard the yacht." The documents Bergen relies on do not include Kerimov as a guest for that trip. Similarly, in paragraph 35(c), Bergen cites to emails attaching records for Gulnara Kerimova's mother, and Gulnara's children and adult siblings, which were required in order to travel to the British Virgin Islands. Notably absent are required travel documents for Kerimov

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

himself. In fact, Kerimov never chartered the vessel and was never a guest on anyone else's charter on the Amadea.

Moreover, Bergen's assertion that "Kerimov himself made his preferences known to the crew" is false. Bergen Aff. ¶ 35(i). The documents Bergen relies on are handover notes from the main deckhand to his counterpart referring to a possible "G0 guest trip." Based on a different email, the Bergen Affidavit wrongfully concludes that Kerimov was G1, where the email stated "Mme [Madame] advised me that G1 will be joining her and her kids for phase 2 Caribbean." Bergen Aff. ¶ 35(e). No document, however, identifies Kerimov as G0 or G1.

In addition, the Bergen Affidavit alleges that the use of code names for guests on the Amadea is evidence of an intent to conceal the identity of Kerimov and his family. Bergen Aff. ¶¶ 34(b), 35(d), 35(e), 35(k). However, the use of code names in the luxury yachting industry is a common practice and is in no way evidence of an intent to conceal the identities of sanctioned individuals. Rather, the practice is used to protect the privacy of guests, and so the crew can speak internally about guests without having to remember names. Code names, such as G1, G2, and G3, are used regardless of whether the guests are owners or charterers. Either the investigators knew that the use of code names was a common industry practice, and intentionally decided to omit that from the affidavit, or were reckless in not taking steps to understand the significance—or lack thereof—of the use of code names in connection with their case.

Third, the Bergen Affidavit claims that "Kerimov's family members" "demanded changes to the yacht." Bergen Aff. ¶ 35(g)-(h). It is true that Ms. Kerimova made requests for changes to the Amadea, given that she was planning to pay almost $20 million to charter it for several months. But none of these requested changes: (1) were outside a reasonable budget given the value of the charter payments; (2) were required to be completed; (3) could be completed

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

without approval from the owner, Mr. Khudainatov; or (4) had to be approved by Mr. Khudainatov, but could be if determined they would further increase the value and appeal of the yacht for a possible future sale. Again, requests like these are not unusual for long-term charterers, especially if the changes will be paid for by the charterer with the owner's approval. In other words, requests for alterations under these circumstances are not proof of ownership.

Fourth, the Bergen Affidavit's theory that Kerimov bought the Amadea is premised on the change in the Amadea's owning company in August 2021. Bergen Aff. ¶ 27; U.S. Bergen Aff. ¶ 32. As set forth above, Mr. Khudainatov is and always has been the Amadea's UBO. The change in the Cayman Islands Registry simply reflected the transfer from Nereo to Millemarin, with Mr. Khudainatov remaining the UBO of the vessel and its financially responsible party. At the time of the Amadea's seizure, Mr. Khudainatov was the UBO of Millemarin. Notably missing from the Bergen Affidavit is any evidence that connects Kerimov to Millemarin— because there is none.

Fifth, the Bergen Affidavit states that because the vessel was no longer available for viewing in the fall of 2021, that somehow corroborates that it had been recently sold. Bergen Aff. ¶ 28. Even if that statement were true, it is consistent with the fact that the vessel was, in fact, taken off the market to make it more desirable to serious potential buyers, and is not evidence of a sale.

Sixth, the Bergen Affidavit claims that "[i]n or about late 2020 or early 2021, an inspection of the Amadea was arranged for Kerimov, and Kerimov personally toured the yacht." Bergen Aff. ¶ 26(b). Kerimov did tour the vessel, and decided not to purchase it because, among other things, he did not like its interior and various technical aspects. He also visited it in October 2021, prior to his daughter's long-term charter, to provide his thoughts on ways to improve her experience while chartering it, and was critical of certain aspects of the vessel during this visit.

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

None of the above-described facts constitutes evidence of ownership. If Bergen included these facts as evidence of ownership in the U.S. Bergen Affidavit, he either deliberately ignored industry norms and failed to disclose them to the court because they did not support the conclusion he wanted the court to reach, or he was reckless in failing to consult industry experts as to the meaning to glean from these facts. When an affidavit fails to include readily discoverable information about industry norms that place these facts in their proper context because it undercuts the desired conclusion, this is callous disregard of the Fourth Amendment. *United States v. Chesher*, 678 F.2d 1353, 1360-61 (9th Cir. 1982) (finding that an affidavit which incorrectly named a defendant as a member of a biker gang was made with reckless disregard for the truth because the affiant ignored several readily discoverable facts showing that the defendant was no longer a member of the gang).

### 4. The Bergen Affidavit falsely claims that the Amadea sought to evade detection, when readily available information showed otherwise.

As part of its "evidence" that Kerimov owns the Amadea, the Bergen Affidavit states that the vessel "turned off its [AIS system] on February 24, 2022, almost immediately after the start of the Russian invasion of Ukraine, and did so intermittently thereafter," in an effort to evade detection by the authorities. Bergen Aff. ¶ 36; U.S. Bergen Aff. ¶¶ 43, 59. However, open-source reporting shows that the Amadea's location was publicly trackable every fifteen minutes between February 24, 2022 and April 12, 2022. The image below is from www.vesselfinder.com, an online AIS ship tracker that anyone can access. The route the Amadea took from the Caribbean to Fiji between those dates is indicated by the blue line on the map below based on data retrieved from that website.

While the system may have been turned off for brief moments for legitimate technical reasons, the boat's precise location was immediately knowable by the public every fifteen minutes. In addition, as is typical of megayachts, other systems on the Amadea track and convey the vessel's location to different jurisdictions.

Further, contrary to the assertions in the Bergen Affidavit, there was no plan to go to Russia. As noted above, the vessel was heading to the Philippines for weeks-worth of maintenance and servicing that had been planned months in advance and was heavily documented in emails amongst crew members who were responsible for making these plans, emails that the government surely has. In addition, none of the required applications were made in order to enter Russia, including but not limited to requests for (i) crew visas, (ii) customs clearance, and (iii) special shipping declarations. Thus, there was no effort to evade detection and escape to Russia, and these allegations are further proof of the government's callous disregard. *Chesher*, 678 F.2d at 1360-61.

### 5. The Bergen Affidavit obscures the absence of any link between Kerimov and the U.S. transactions that provide the entire basis for the seizure.

As demonstrated above, the Bergen Affidavit fails to establish probable cause that Kerimov owns the Amadea, or that the U.S. transactions were made by him or on his behalf for the benefit of the Amadea. To be clear, the government does not

allege that the purported sale of the vessel to Kerimov was itself a sanctions violation or otherwise a violation of law. Rather, the allegation is that only after the vessel was allegedly purchased by Kerimov—which it never was—and payments were made to vendors in U.S. dollars or through U.S. financial institutions for its upkeep, did a crime occur.

In an attempt to support that allegation, the Bergen Affidavit lists a series of invoices addressed to Millemarin that were to be paid in U.S. dollars that were found on the Amadea, but does not provide evidence that any of these invoices were actually paid or attempted to be paid. Bergen Aff. ¶ 40.[26] Unpaid invoices, on their own—even if sent to a sanctioned individual, which did not occur here—do not constitute sanctions evasion or money laundering.

The Bergen Affidavit then describes payments that were actually made on behalf of the Amadea, including a mere $6,651.50 payment for agent fees in Antigua, and U.S. dollar payments in an unspecified amount to the Cayman Islands Shipping Registry. Bergen Aff. ¶¶ 41-42. However, the government fails to set forth even a scintilla of evidence linking any of these payments to Kerimov. Without evidence that these payments were made by or on behalf of Kerimov, there is no probable cause that any crime was committed.

Even assuming *arguendo* that the above payments constituted sanctions evasion, the Amadea does not constitute "proceeds" of these alleged "unlicensed dollar transactions," which amount to a mere fraction of the vessel's worth. Even $1 million in U.S. dollar transactions, which is far more than what the government alleges took place here, constitutes a paltry .003 per cent of the yacht's worth. What

---

[26] The U.S. Bergen Affidavit includes the same number of subparagraphs that delineate the invoices as is included in the Fiji version, although the subparagraphs in the U.S. version are redacted. U.S. Bergen Aff. ¶ 48. Thus, Petitioners believe the same invoices are listed in both Affidavits.

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

would be forfeitable would be the items purchased, or the value thereof, by the violative payments. Under these circumstances, civil forfeiture of the Amadea, particularly the entirety thereof, is not permitted. *See, e.g., United States v. Real Prop. & Premises*, 657 F. Supp. 2d 1060 (D. Minn. 2009) (explaining it is well-established that where the government does not allege that real property was purchased with the proceeds of fraud, but rather that improvements to the property and property taxes were paid with illicit funds, the government may only seek forfeiture of the property in part) (citing *United States v. 7725 Unity Ave. N*, 294 F.3d 954, 958 (8th Cir. 2002)).

\* \* \*

Based on the foregoing, Petitioners submit that this Court should conclude that the government callously disregarded the Fourth Amendment's probable cause requirement, satisfying the first *Ramsden* factor.

**B.     Petitioners own the Amadea, and therefore have an individual interest in and need for the property.**

Mr. Khudainatov's interest in the property is clear: he is and always has been the UBO of the Amadea, which is owned by his company Millemarin. In addition, the transfer from Nereo to Millemarin does not prove a change in ownership to Kerimov. This exact transfer is the event that the government alleges in the Bergen Affidavit was the transfer to Kerimov. Bergen Aff. ¶ 27; U.S. Bergen Aff. ¶¶ 27, 32. However, Mr. Khudainatov still owned the vessel after the re-registration and continued to be the financially responsible party to pay its invoices going forward.

There is no evidence that Mr. Khudainatov sold the vessel to Kerimov, either in August 2021, or at any time. The types of events that must occur with the sale of a vessel of this value and magnitude did not happen here. In the event of a sale, both the seller and the buyer would hire major law firms to conduct transactional due diligence, which would last months. Divers would submerge to inspect the

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

submerged part of the vessel. The vessel would be hoisted out of the water and dry-docked for a comprehensive survey to be conducted on behalf of the buyer. The final sale would usually be completed in international waters for taxation purposes. The new owner would typically replace the previous owner's crew. None of these events occurred, and there were no other markers of a sale that took place in the time leading up to August 2021 or anytime thereafter. In addition, to the extent the allegations about the availability of viewings are credited, they are consistent with the fact that Mr. Khudainatov opted to take the Amadea off the market at the time.

As the irrefutable owner of the Amadea, Mr. Khudainatov has an individual interest in the vessel and the need for its return. *See United States v. Harrell*, 530 F.3d 1051, 1057 (9th Cir. 2008) ("The person from whom the property is seized is presumed to have a right to its return"). He legally commissioned the building of the AMADEA, and there is no evidence that it is contraband or that the government has a factual and legal basis to forfeit it. Particularly given the government's closure of the investigation, Mr. Khudainatov is presumed entitled to its return. The government here can set forth no justification for its continued possession. *See Martinson*, 809 F.2d at 1369-70.

### C. Petitioners would be irreparably injured by denying the immediate return of the property.

Mr. Khudainatov would be irreparably injured by the denial of the relief requested for several reasons. Assets like the Amadea depreciate in value as time passes. Mr. Khudainatov will never get back use and enjoyment of his property for the past 18 months that the Amadea has been in U.S. custody. He has been unable to sell or charter the vessel. The longer the vessel stays in U.S. custody, the more tainted the asset will become to potential buyers as having been seized by the U.S. government. Its value at the time it was seized has declined.

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

In addition to the mere passage of time leading to its depreciation, the AMADEA has likely not been properly maintained at the levels an owner would maintain it, while it has been in U.S. custody. Under federal regulation, the U.S. Marshals Service ("USMS") has primary authority over "[m]aintenance of custody, management control, and disposal of property and money seized or forfeiture pursuant to any law enforced or administered by the Department of Justice." 28 C.F.R. § 0.111(i); *see also* Asset Forfeiture Policy Manual (2023) Chap. 10, Sec. I. A. Upon information and belief, the USMS has not been adequately maintaining the vessel and its substandard care has already resulted in significant depreciation in value. The interior and exterior finishings require regular upkeep, and for the interior temperature and humidity to be controlled at certain levels. Among other significant issues, there was a hole in the hull of the vessel that Petitioners understand has not yet been fixed. The current state of the vessel as well as the government's likely failure to maintain the vessel at appropriate levels has created a situation where there is potential for economic and environmental disaster.

Lastly, the Amadea was personally designed by Mr. Khudainatov with great care. It was his first commissioned megayacht, and he spent five years making his vision for the vessel come to life. The Amadea has personal value to Mr. Khudainatov, and if not returned, he will suffer irreparable injury. *See Gibani v. Barr*, No. EDCV191009JGBKKX, 2019 WL 8112511, at *2 (C.D. Cal. Oct. 11, 2019) (finding that because the electronic devices contain items of personal value, the movant would suffer irreparable injury if not returned).

### D.   Petitioners have no adequate remedy at law.

As there has been no civil forfeiture proceeding or criminal indictment filed, and in fact the government has closed its criminal investigation of Mr. Khudainatov relating to the Amadea, Petitioners have no legal means for seeking the return of the Amadea other than through this motion. Indeed, as the Ninth Circuit stated in

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

*Omidi v. United States*, 851 F.3d 859, 862-63 (9th Cir. 2017), "[o]wners of personal property worth more than $500,000 are not left without recourse to the courts when the government seizes their property and delays initiating judicial forfeiture proceedings for months or years on end," as "[t]hey can file a [41(g)] motion."

Petitioners have been asking the government to return the Amadea since early September 2022. Petitioners made three attorney proffers to the DOJ and have voluntarily produced documents and other evidence in its efforts to convince the government to return the Amadea. Unfortunately, these negotiations came to an insurmountable impasse when the government continued to assert that Kerimov owned the vessel with no evidence supporting that assertion. Petitioners' only recourse is to file this motion seeking the Amadea's return. As of this filing, there is no pending proceeding involving the Amadea, and the government has closed its criminal investigation of Mr. Khudainatov relating to the Amadea. As such, Petitioners have no adequate remedy at law and therefore satisfy this requirement.

Even if the government files a forfeiture action, this Court should nevertheless retain jurisdiction of this case because the property is located in this venue and venue is proper here. The government may attempt to forum shop where they file a forfeiture action, but this Court should not countenance such gamesmanship. The government chose this venue by sailing the vessel to San Diego.

## II.   PETITIONERS ARE PRESUMED ENTITLED TO THE AMADEA'S RETURN

If this Court decides to exercise its equitable jurisdiction over this matter—which it should—Petitioners respectfully request that this Court order the return of the Amadea. Where, as here, the government has abandoned its investigation and cannot prove a basis to forfeit the vessel, the person from whom the property was seized "is presumed to have a right to its return." *Martinson*, 809 F.2d at 1369. In addition, determining the merits of a request for the return of property under Rule

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

41(g) must be one of "reasonableness under all of the circumstances." *Ramsden*, 2 F.3d at 326 (quotations omitted). The Ninth Circuit continued that the government's "retention of the property generally is reasonable if it has a need for the property in an investigation or prosecution." *Id.*

Here, there is no such need. Petitioners have demonstrated conclusively that the Amadea is owned by the Petitioners, as well as the fatal flaws in the Seizure Warrant that render the government's seizure of the Amadea illegal in the first place. But to this very point, the government has since closed its criminal investigation into Mr. Khudainatov regarding the Amadea, conceding that it cannot prove the basis to forfeit the Amadea that is set forth in the Bergen Affidavit. And the government did so after executing multiple search warrants on the IT systems of the Amadea; they collected everything they needed from the vessel, and the evidence has fallen short of establishing probable cause that Kerimov owns the vessel or proving the basis for a forfeiture. What the government did obtain from the vessel were the ownership documents demonstrating that Mr. Khudainatov is the UBO of the vessel. The government, therefore, cannot meet its burden and justify its continued possession of the Amadea. Petitioners are confident, therefore, that upon reviewing a complete record in this case, this Court will order the government to release the Amadea to its rightful owner, Mr. Khudainatov.

## III. THIS COURT SHOULD GRANT PETITIONERS A *FRANKS* HEARING

The Bergen Affidavit is rife with demonstrable falsehoods, entitling Petitioners to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)

Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56.

Here, the government knowingly or recklessly falsely stated that: crew members identified Kerimov as the true owner of the Amadea, when in fact they did not; the AIS system on the Amadea was turned off to evade detection, when in fact the AIS system remained on throughout its voyage; and invoices were paid by Kerimov, when in fact there is no evidence linking Kerimov to any vendor payment.

As demonstrated above, the false statements attributed to the crew members and the likely omissions of the crew member statements who said that Mr. Khudainatov owned the Amadea or that they did not know who did, are material to the question of probable cause. First, these false statements and omissions go to the key question of whether Kerimov, a sanctioned individual, owned the Amadea. Second, a layperson who is unfamiliar with the megayacht industry would perhaps give more weight than is due to the crew member statements regarding ownership. Presenting this "evidence" in the Bergen Affidavit without explaining that crew members on these types of vessels typically do not have first-hand knowledge of vessel ownership appears intentionally misleading.

Without all of the above falsehoods, there is no probable cause. The Bergen Affidavit is left with the statements of the unidentified members of the yacht-brokerage community who did not have first-hand knowledge of who owned the Amadea, the facts regarding Ms. Kerimova's charter which do not equate to ownership, and Bergen's unsubstantiated conclusion that Mr. Khudainatov is a straw owner for Kerimov without having the training, experience, or reliable evidence to make that claim. As demonstrated above, each of these categories of "evidence" is flawed in its own right, and even taken together do not amount to probable cause that Kerimov owned the vessel. Because Petitioners have made a

MEMORANDUM IN SUPPORT OF MOTION UNDER Fed. R. Crim. P. 41(g)

substantial preliminary showing, Petitioners request a *Franks* hearing as part of this proceeding.

## CONCLUSION

The Amadea's seizure was purely political, and unlawful. The government spent more than a year and a half trying to develop evidence to prove *ex post facto* the knowingly flawed theory that Kerimov owned the Amadea, but the government failed to do so because it is simply not true. Given the government's closure of its investigation, the government has no basis to continue to hold the Amadea, and no factual or legal basis to seek to forfeit the Amadea. Therefore, Mr. Khudainatov is presumed entitled to its return. Petitioners respectfully request that this Court exercise jurisdiction over this matter and order the return of the vessel to Mr. Khudainatov.

Dated: October 23, 2023

*/s/ Michael Jason Lee*
Michael Jason Lee
**LAW OFFICES OF MICHAEL JASON LEE, APLC**
4660 La Jolla Village Drive, Suite 100
San Diego, California 92122
Telephone: (858) 550-9984
michael@mjllaw.com

Adam C. Ford
Renée L. Jarusinsky
Bryan W. McCracken
**FORD O'BRIEN LANDY LLP**
275 Madison Avenue, 24th Floor
New York, New York 10016
Telephone: (212) 858-0040
aford@fordobrien.com
rjarusinsky@fordobrien.com
bmccracken@fordobrien.com
(*pro hac vice applications pending*)

Attorneys for Petitioners
Eduard Yurievich Khudainatov
and Millemarin Investments Ltd.,
a British Virgin Islands Company

MEMORANDUM IN SUPPORT OF MOTION UNDER FED. R. CRIM. P. 41(g)